**FOURTH DIVISION**
**DILLARD, C. J.,**
**DOYLE, P. J., and MERCIER, J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**June 25, 2018**

# In the Court of Appeals of Georgia

A18A0263. IN THE INTEREST OF R. B. et al., children.

MERCIER, Judge.

C. M. ("the mother") appeals from the order entered April 4, 2017, nunc pro tunc to December 9, 2016, by the Juvenile Court of Douglas County finding her minor children R. B. and T. B. dependent and granting temporary custody of the children to their maternal grandmother. The mother contends that the juvenile court erred by: (1) ordering the removal of the children from her custody without following statutory guidelines for changing custody and without making the requisite findings under OCGA § 15-11-134; (2) failing to dismiss the petition for dependency without prejudice when hearings were not held within the statutorily-mandated time frames and the mother did not receive proper notice of the proceedings; and (3) adjudicating the children dependent when there was not clear and convincing evidence of dependency.

For the following reasons, we vacate the judgment in part, reverse it in part, and remand the case with direction.

1. The mother contends that the juvenile court erred by removing R. B. and T. B. from her custody and from the children's home without following the statutory guidelines set out in OCGA § 15-11-133, without making the findings required by OCGA § 15-11-134, and without holding a preliminary protective hearing within 72 hours of the children's removal as required by OCGA § 15-11-145 (a).

OCGA § 15-11-133 (a) provides that "[a] child may be removed from . . . her home, without the consent of . . . her parents, guardian, or legal custodian: (1) [p]ursuant to an order of the court under this article[.]" "Any order authorizing the removal of a child from . . . her home shall be based on a finding by the court that continuation in . . . her home would be contrary to . . . her welfare." OCGA § 15-11-134 (a). "Any order continuing a child's placement outside of the physical custody of . . . her parent, guardian, or legal custodian shall be based on a finding by the court that return of such child to such custody would be contrary to . . . her welfare." OCGA § 15-11-134 (b). "Findings under this Code section shall be made on an individualized case-by-case basis and shall be documented in the court's written order." OCGA § 15-11-134 (c).

"Foster care" is defined as "placement in foster family homes, child care institutions, or another substitute care setting approved by the department." OCGA § 15-11-2 (34). "A child taken into custody shall not be placed in foster care prior to the hearing on a petition for dependency unless: . . . [f]oster care is required to protect the child; . . . or . . . [a]n order for the child's foster care has been made by the court." OCGA § 15-11-135 (a). Pursuant to OCGA § 15-11-135 (c) (3), "[a]n alleged dependent child may be placed in foster care" in the home of a relative. "If an alleged dependent child is removed from . . . her home and is not returned home, the preliminary protective hearing shall be held promptly and not later than 72 hours after such child is placed in foster care[.]" OCGA § 15-11-145 (a). "Reasonable oral or written notice of the preliminary protective hearing . . . shall be given to . . . [the child's] parent [if such person can be found]." OCGA § 15-11-145 (b).

As explained below, the mother is correct that the statutory requirements for removal of custody were not followed here, specifically those requiring a preliminary protective hearing within 72 hours after the children were placed in foster care, reasonable notice of the hearing to the parent, and an order that included certain written findings regarding the children's welfare.

On September 2, 2016, the Douglas County Department of Family and Children Services (the "Department") filed a non-emergency petition for dependency and complaint, which stated that the children resided with their maternal grandmother, that "the Department placed the minor children with the maternal grandmother through a Safety Plan agreement[,]" and that the children were not taken into custody under the provisions of OCGA § 15-11-132.[1] A hearing on the petition was scheduled for September 26, 2016. On that date the mother was not present in court. Counsel for the Department stated, "we don't have proof of service back from the sheriff, so I do not know if . . . [the mother has] been served."

The juvenile court stated that it understood that the maternal grandmother "ha[d] been taking care of" the children, and announced that it was "go[ing] ahead and enter[ing] an order placing the children temporarily in [the maternal grandmother's] custody." The Department confirmed with the maternal grandmother that the address that was provided to the sheriff's office for service of the petition on the mother was correct. The attorney for the children then informed the court that the children had not "indicated that they want[ed] to go back with [the mother]," and the guardian ad litem

---

[1] OCGA § 15-11-132 involves verbal custody orders.

4

informed the court that the children were "fearful" of the mother coming to their school. The juvenile court stated, "I will enter an order that they cannot have any contact with their mother until she appears before the [court][.]"

The juvenile court asked the Department's counsel, "[s]o how much time do you want to tag the parents?" The Department's counsel replied, "it depends on what we get back from the sheriff. I would say 60 days"; the court then stated that the hearing would be continued until November 28, 2016. The court next instructed the maternal grandmother: "[W]hat I want [the mother] to know is if she wants to have contact with her children, if she will come up here and apply for an attorney, I can move the court date up."

On September 26, 2016, the juvenile court entered an "Interim Custody Order" which stated, "[maternal grandmother] has . . . been awarded legal and physical custody of the . . . children." Then, on November 23, 2016, nunc pro tunc to September 26, 2016, the court entered an order stating that the September 26, 2016 matter was being continued "for good cause" until November 28, 2016 "for an adjudication," that "temporary custody and control" of the children was awarded to the maternal grandmother, and that the mother was prohibited from having contact with

the children "until such time as she appear[ed] before the [c]ourt." Neither order included the findings required by OCGA § 15-11-134.

The mother submitted a financial affidavit for appointment of counsel in the dependency case on September 28, 2016, and an attorney was appointed to represent her on September 29, 2016. At the November 28, 2016 adjudication hearing, the mother appeared with counsel, acknowledged service of the petition, and requested a "trial date." Counsel for the mother stated, "I may be filing a motion to dismiss," and argued,

> [the mother] has not been served until today when she's acknowledging service. She's had no contact with the Department. They've acknowledged that they had the wrong phone number for her and we're just now having a hearing. So . . . the 72-hour hearing, . . . the 10-day hearing, none of that has taken place in this case. And she's gone now three months . . . having her due process rights violated by having her children removed from her custody.

The juvenile court then set the case for the adjudication hearing to be held on December 9, 2016.

At the December 9, 2016 adjudication hearing, the mother's counsel argued that the petition should be dismissed pursuant to OCGA § 15-11-133 and OCGA § 15-11-

6

145 because "there was never a . . . 72-hour hearing after . . . removal. [The mother] did not have notice of the hearing. And the custody order does not set up a factual basis as to why the children were being removed and placed in the custody of [the maternal grandmother]." Counsel for the mother further argued, "the children were effectively removed from [the mother's] custody in September and as we sit here today in December, she has not had an opportunity to contest the removal[.]" The juvenile court found that the mother's motion had not been filed and was not timely, and denied it. After hearing evidence, the juvenile court found the children to be dependent as to the mother.[2] The court further noted, "this is not a case where the children were removed by the State. The Department filed the petition following an investigation, set it for a hearing. The mother was not served, apparently, for the [September 26, 2016] hearing. The custody order was entered because the children were with the grandmother without her having the ability to address things like medical, dental care." The juvenile court entered an order on April 4, 2017, nunc pro tunc to

---

[2] The petition also alleged that the children were dependent as to their father, but the December 9, 2016 hearing addressed the dependency of the children only as to the mother. The father is not a party to this appeal.

December 9, 2016, finding the children dependent as to the mother and granting temporary custody of the children to their maternal grandmother.

The Department contends that the children were not in foster care. It also argues that removal of the children from the mother's custody is distinguishable from removal of the children from their home and, in this case, the children were not removed from their home inasmuch as prior to the dependency proceedings they had lived with their grandmothers "for an extended period of time." Therefore, the Department argues, the juvenile court was not required to hold a preliminary protective hearing or comply with the other statutory provisions related to removal of the children from their home.

In support of its argument that the children were not removed from their home, the Department cites *In the Interest of J. W. K.*, 276 Ga. 314 (578 SE2d 396) (2003). In that case, the Court held that former OCGA § 15-11-58 (a) (2000) (which set forth procedural requirements related to the removal of a child from the child's home in connection with a deprivation action) did not apply where the juvenile court granted legal custody to a child's aunt and uncle for two years because "the evidence [was] irrefutable that the only home [the child] ha[d] known" for the preceding ten years was the home of his aunt and uncle; the child's mother had not provided a home for him for ten years; the child's aunt and uncle had cared and provided for the child for ten

years; the mother had seen the child infrequently; and the mother had "assumed virtually no responsibility for . . . his well-being." Id. at 315-316 (1).

The instant case is distinguishable from *In the Interest of J. W. K.*, and we agree with the mother that the children in this case were removed from their home and were placed in foster care as contemplated by the dependency statutes. The evidence before the juvenile court on December 9, 2016 showed that, prior to the Department's involvement, the children were residing with the paternal grandmother for the summer (by agreement with the mother). The mother "was to pick [the children] up at the end of the summer to go back to school." When the paternal grandmother needed to travel to Ohio to visit her ailing father, she contacted the mother to request that she pick up the children. The mother replied that she could not get the children at that time because she had plans to travel to Florida. The paternal grandmother told the mother that if she did not come to pick up the children, the paternal grandmother would call the maternal grandmother to see if she would get the children. The mother did not respond, and the maternal grandmother picked up the children and kept them "all summer."

A. M., an investigator for the Department, testified that in July 2016, the Department received a telephone call in which someone expressed concerns regarding how the children were being disciplined. A. M. began an investigation, and while the

9

mother was still out of town, A. M. interviewed the maternal grandmother and the children. When A. M. later met with the mother in August 2016, the mother was angry and said that A. M. could "send [the children] to foster care." A. M. told the mother that the Department was not going to take the children, "but [was going to] leave them in [the maternal grandmother's] custody." The juvenile court thereafter entered the September 26, 2016 order awarding temporary custody of the children to the maternal grandmother, and prohibiting the children from having any contact with the mother until she appeared before the court.

At the December 9, 2016 hearing, the mother testified as follows. She received a telephone call from the Department on August 8, 2016, which was the children's first day of school. She had tried "to get [the children] for that weekend to make sure that they were situated before school started." She then called the maternal grandmother "repeatedly" on August 8, 2016, "trying to figure out why [the Department] was calling [the mother]." The maternal grandmother told the mother that the Department had attempted to contact the mother "before"; the mother saw that she had one missed call from the Department. The mother spoke with A. M. and with K. F., another Department employee, and was "advised" that the Department was "going to do . . . [an] investigation." The mother assumed that the Department was going to contact her.

10

The mother spent time with R. B. and T. B. on their birthdays on August 13, 2016 and September 10, 2016. Later, the mother sent a text message to the maternal grandmother and "asked her for the [children] [for the] weekend." The maternal grandmother sent the mother a text message informing her that the mother's custody of the children had been "removed," that "[the maternal grandmother had] temporary custody of [the children]," and that the mother had "missed a court date[.]"

There was no evidence before the juvenile court that, prior to the Department's involvement, the children's residence with the maternal grandmother was anything other than a temporary arrangement, which arrangement the mother could have ended at any time. See generally *In the Interest of M. F.*, 298 Ga. 138, 145 (2) (780 SE2d 291) (2015) (recognizing the fundamental right of parents to direct the upbringing of their children, that parents have a fundamental liberty interest in the care, custody and management of their children, and that unless and until that relationship is lawfully terminated, parents retain parental rights). The evidence did not demonstrate that the maternal grandmother's home was the children's home. Compare *In the Interest of J. W. K.*, supra. The juvenile court's order of September 26, 2016 constituted a removal of the children from their home with the mother and a removal of custody of the children from the mother. In these circumstances, the juvenile court was required to

hold a preliminary protective hearing within 72 hours of the court's grant of custody to the maternal grandmother, with reasonable notice given to the mother, see OCGA § 15-11-145, and to make the findings required by OCGA § 15-11-134 (a), (c). The court erred by not holding the hearing within the required time period, by not giving the mother proper notice of the hearing, and by not making the required written findings.

2. The mother contends that because the statutory time frame for the hearing was not followed and she did not receive proper notice of the proceedings, the trial court erred by not dismissing the dependency petition (without prejudice). We agree.

The notice and hearing requirements of the juvenile code are mandatory, and if the procedural safeguards are not followed, "dismissal of the petition would be without prejudice. Another petition can be filed without delay if there is reason to believe the child[ren are] being neglected or abused." *Sanchez v. Walker County Dept. of Family & Children Services*, 237 Ga. 406, 407, 411 (229 SE2d 66) (1976) (holding that the notice and hearing requirements of former Ga. Code §§ 24A-1402 (a) and 24A-1404 (c) (requiring prompt notice to parents when a child is taken into custody, and an informal detention hearing within 72 hours after a child is placed in detention, with reasonable notice to the parents) are mandatory); see *In the Interest of E. C.*, 291

12

Ga. App. 440, 441 (662 SE2d 252) (2008) (applying *Sanchez* in the context of former OCGA § 15-11-49 (e), which required the filing of a petition within five days of a detention hearing if an allegedly deprived child was not released from shelter care at such hearing).

"We applaud the important function performed by the Department . . . in protecting children who are mistreated by their parents. However, wresting a child away from the care and custody of [his or her] parents is of serious consequence. It is so drastic that it should be attended only by the most stringent procedural safeguards." *Sanchez*, supra at 411 (citation omitted). Because the statutory requirements were not followed here, we vacate the September 26, 2016 order granting temporary custody to the maternal grandmother, reverse the juvenile court's denial of the mother's December 9, 2016 motion to dismiss the petition as to the mother, vacate the juvenile court's December 9, 2016 order finding the children dependent as to the mother and continuing the maternal grandmother's temporary custody of the children, and remand the case with instruction that the dependency petition be dismissed without prejudice as to the mother.

3. Given our holding in Divisions 1 and 2, we need not address the mother's remaining contention.

13

*Judgment reversed in part and vacated in part and remanded with direction.*

*Doyle, P. J., concurs, Dillard, C. J., concurring fully and specially.*

A18A0263. IN THE INTEREST OF R. B. et al., children.

DILLARD, Chief Judge, concurring fully and specially.

The liberty interest of parents to direct the upbringing, education, and care of their children is the most ancient of the fundamental rights we hold as a people.[1] This most cherished right derives from the natural order, preexists government, and may not be interfered with by the State except in the most compelling circumstances. And even then, both the federal and Georgia constitutions require that parents be afforded due process. Unfortunately, this case presents yet another troubling example of a parent's right of familial relations being interfered with by our government without such procedural protections. I write separately, then, to express my grave concerns about the trial court's failure to recognize and safeguard the mother's constitutional right to familial relations with her children.

Juvenile courts must be mindful in every case that, regardless of any perceived authority given to them by Georgia's Juvenile Code to interfere with a natural parent's custodial relationship with his or her child, such authority is *only* authorized if it comports with the long-standing, fundamental principle that "[p]arents have a constitutional right under the United States and Georgia Constitutions to the care and

---

[1] I concur fully in the majority's thoughtful and well-reasoned opinion. As a result, it may be cited as binding precedent. *See* Court of Appeals Rule 33.2 (a) (1).

custody of their children."[2] In this respect, the Supreme Court of the United States has acknowledged that "[t]he liberty interest . . . of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests . . . ."[3] Moreover, although a parent's right to raise his or her children without state

[2] *Clark v. Wade*, 273 Ga. 587, 596 (IV) (544 SE2d 99) (2001) (plurality opinion); *see Meyer v. Nebraska*, 262 U.S. 390, 399 (43 SCt 625, 67 LEd 1042) (1923) (noting that the "liberty interest guaranteed by the Fourteenth Amendment [to the United States Constitution] includes freedom . . . to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home[,] and *bring up children*, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men" (emphasis supplied)); *see also Prince v. Massachusetts*, 321 U. S. 158, 166 (64 SCt 438, 88 LEd 645) (1944) (noting that there is a "private realm of family life which the state cannot enter"); *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 535 (45 SCt 571, 69 LEd 1070) (1925) ("The child is not the mere creature of the state; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations."); *In the Interest of M. F.*, 298 Ga. 138, 144-45 (2) (780 SE2d 291) (2015) ("The presumption that children ordinarily belong in the care and custody of their parents is not merely a presumption of the statutory and common law, but it has roots in the fundamental constitutional rights of parents. The Constitution secures the fundamental right of parents to direct the upbringing of their children, and it protects a private realm of family life which the state cannot enter without compelling justification." (punctuation and citation omitted)); *Brooks v. Parkerson*, 265 Ga. 189, 191 (2) (a) (454 SE2d 769) (1995) ("The U.S. Supreme Court has long recognized a constitutionally protected interest of parents to raise their children without undue state interference."); *see generally* U.S. Const. amend. IX ("The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others *retained* by the people.") (emphasis supplied); U.S. Const. amend. XIV, § 1 (". . . No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States . . . ."); Ga. Const. Art. 1, § 1, XXIX ("The enumeration of rights herein contained as part of this Constitution shall not be construed to deny to the people any *inherent rights* which they may have hitherto enjoyed.") (emphasis supplied).

[3] *Troxel v. Granville*, 530 U.S. 57, 65 (II) (120 SCt 2054, 147 LE2d 49) (2000) (plurality opinion); *see id.* at 68 (II) (noting the constitutional presumption that "fit

2

interference is largely expressed as a "liberty" interest, the Supreme Court of the United States has also noted that this right derives from "privacy rights" inherent in the text, structure, and history of the federal constitution.[4]

---

parents act in the best interests of their children"); *Parham v. J. R.*, 442 U.S. 584, 602 (III) (b) (99 SCt 2493, 61 LE2d 101) (1979) (noting that the federal constitution's "concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions," and that "natural bonds of affection lead parents to act in the best interest of their children"); *see also* 2 ST. GEORGE TUCKER, BLACKSTONE'S COMMENTARIES WITH NOTES OF REFERENCE TO THE CONSTITUTION AND LAWS OF THE FEDERAL GOVERNMENT OF THE UNITED STATES AND THE COMMONWEALTH OF VIRGINIA 446 (Birch & Small 1803) ("The duty of parents to provide for the maintenance of their children is a principle of natural law."); 2 JAMES KENT, COMMENTARIES ON AMERICAN LAW 169 (O. Halsted 1827) (noting that "[t]he rights of parents result for their duties [to their children]," and "the law has given them such authority"); JOHN LOCKE, SECOND TREATISE OF GOVERNMENT, Ch. 6, § 71 (Hackett Publishing Co., Inc. 1980, originally published in 1690) ("This shews the reason how it comes to pass, that *parents in societies*, where they themselves are subjects, retain a *power over their children*, and have as much right to their subjection, as those who are in the state of nature.").

[4] *See Brooks*, 265 Ga. at 191-92 (2) (a); *see also Clark*, 273 Ga. at 606 (Thompson, J., dissenting) ("Under the Due Process Clause of the Fourteenth Amendment, and our state constitution, parents have a fundamental liberty interest *and privacy right* in raising their children without undue state influence." (emphasis supplied)); *see, e. g.*, *Prince*, 321 U.S. at 165 (recognizing a parent's authority over rearing his or her children and the right of a parent to control over and training of her child as "sacred private interests" that are "basic in a democracy").

3

In Georgia, a parent's natural right to familial relations is also recognized "under our state constitutional protections of liberty and privacy rights."[5] Indeed, Georgia courts have repeatedly recognized that "the constitutional right to raise one's children is a fiercely guarded right in our society and law, and a right that should be infringed upon only under the most compelling circumstances."[6] In fact, according to our Supreme Court, "there can scarcely be imagined a more fundamental and fiercely guarded right than the right of a natural parent to [his or her] offspring."[7] And the "fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents.

---

[5] *Brooks*, 265 Ga. at 192 (2) (a). *Cf. Powell v. State*, 270 Ga. 327, 330-31 (2) (510 SE2d 18) (1998) ("[T]he 'right to be let alone' guaranteed by the Georgia Constitution is far more extensive tha[n] the right of privacy protected by the U.S. Constitution, which protects only those matters 'deeply rooted in this Nation's history and tradition' or which are 'implicit in the concept of ordered liberty.'").

[6] *In the Interest of D. M.*, 339 Ga. App. 46, 52 (793 SE2d 422) (2016) (punctuation omitted); *accord In the Interest of J. C.*, 242 Ga. 737, 738 (1) (251 SE2d 299) (1978); *In the Interest of S. O. C.*, 332 Ga. App. 738, 743 (774 SE2d 785) (2015); *In the Interest of J. V. J.*, 329 Ga. App. 421, 425 (765 SE2d 389) (2014); *In the Interest of C. J. V.*, 323 Ga. App. 283, 283 (746 SE2d 783) (2013); *In the Interest of M. A.*, 280 Ga. App. 854, 856 (635 SE2d 223) (2006).

[7] *In the Interest of M. F.*, 298 Ga. at 145 (2) (punctuation omitted); *accord Floyd v. Gibson*, 337 Ga. App. 474, 479 (1) (788 SE2d 84) (2016).

4

. . ."[8] Put another way, the focus of a determination of whether a parent is fit for the purposes of custody

> must be the parent's ability to provide for the children in a manner sufficient to preclude the need for an entity of the government to intervene and separate the children from the parent, and a court is not permitted to terminate a parent's natural right to custody merely because it believes that the children might have better financial, educational, or moral advantages elsewhere, that is, the parent's ability to raise his children is not to be compared to the fitness of a third person.[9]

To be sure, parental rights are not absolute. But when this fundamental liberty interest is at stake, the court must "give full, fair, and thoughtful consideration to the serious matter at hand."[10]

---

[8] *In the Interest of M. F.*, 298 Ga. at 145 (2); *accord Santosky v. Kramer*, 455 U.S. 745, 753 (II) (102 SCt 1388, 71 LE2d 599) (1982); *In the Interest of S. O. C.*, 332 Ga. App. at 746-47 (3).

[9] *Floyd*, 337 Ga. App. at 476-77 (1) (punctuation omitted); *accord Harris v. Snelgrove*, 290 Ga. 181, 182 (2) (718 SE2d 300) (2011); *Wade v. Wade*, 272 Ga. 526, 527 (1) (531 SE2d 103) (2000).

[10] *Floyd*, 337 Ga. App. at 479 (1); *accord In the Interest of C. H.*, 343 Ga. App. 1, 15 (805 SE2d 637) (2017) (Dillard, C. J., concurring fully and specially) (Certiorari review granted by the Supreme Court of Georgia on June 18, 2018. See S18C0322.)

In construing our Juvenile Code to comport with these constitutional safeguards, we have explained that there are three constitutionally based presumptions in making a custody determination: "(1) the parent is a fit person entitled to custody, (2) a fit parent acts in the best interest of his or her child, and (3) the child's best interest is to be in the custody of a parent."[11] Furthermore, we have also emphasized that "[t]o authorize even a *temporary* loss of custody by a child's parent, the [dependency[12]] must be shown to have resulted from unfitness on the part of the

---

[11] *Brawner v. Miller*, 334 Ga. App. 214, 216 (778 SE2d 839) (2015) (punctuation omitted); *accord Clark*, 273 Ga. at 593 (II); *Trotter v. Ayres*, 315 Ga. App. 7, 8-9 (2) (726 SE2d 424) (2012); *Galtieri v. O'Dell*, 295 Ga. App. 797, 798 (673 SE2d 300) (2009).

[12] Our old Juvenile Code was substantially revised in 2013, and the new Juvenile Code applies to this case because it was initiated in 2015, after the revisions were enacted. *See In the Interest of M. F.*, 298 Ga. at 138 n.1; Ga. L. 2013, p. 294, § 5-1 (providing that the Juvenile Code became effective on January 1, 2014). And "[t]oday, the law no longer speaks of a 'deprived child,' but instead refers to a 'dependent child.'" *In the Interest of M. F.*, 298 Ga. at 138 n.1. Although this case was decided under the new Juvenile Code, several of the cases relied upon in this concurrence regarding the requirements to justify the removal of a child from his or her parent's custody or the termination of parental rights were decided under the old Code and use the terms "deprived" and "deprivation," rather than "dependent" and "dependency." Nevertheless, given the similarities between the definitions of these terms, Georgia courts have repeatedly indicated that, to the extent that there is any meaningful distinction between a "deprived child" under the old Code and a "dependent child" under the new Code, it is an unimportant one in cases involving child custody or termination of parental rights. *See id.* at 144 (2) (explaining that the reappearance of a fit parent is a material change in circumstances that can render a child no longer

6

parent, that is, either intentional or unintentional misconduct resulting in the abuse or neglect of the child or by what is tantamount to physical or mental incapability to care for the child."[13]  Significantly, an order temporarily transferring custody of a child based on alleged dependency "must be grounded upon a finding that the child is at the *present* time a [dependent] child, and a finding of parental unfitness is essential to support an adjudication of present [dependency]."[14] And, of course, the child's

---

"deprived" *or* "dependent" for purposes of a custody determination); *In the Interest of C. J. V.*, 333 Ga. App. 844, 847-48 (2) (777 SE2d 692) (2015) (noting the similarities between the statutory definitions of "deprived" and "dependent" and rejecting a mother's argument that there was insufficient evidence to support the termination of her parental rights merely because the juvenile court, in a case in which the new Code applied, found her child "deprived" rather than "dependent"); *In the Interest of G. R. B.*, 330 Ga. App. 693, 693 n.1 (769 SE2d 119) (2015) (setting forth the similarities in the statutory definitions of "deprived" and "dependent," and noting that, even though the juvenile court improperly used "dependent" in its order, this Court would use "deprived" instead because the old Juvenile Code applied at the time the petitions were filed). For purposes of consistency and because the new Code applies, I am only using the terms "dependent" and "dependency" in this separate opinion.

[13] *In the Interest of E. N. R.*, 323 Ga. App. 815, 816 (748 SE2d 293) (2013) (punctuation omitted; emphasis omitted); *accord  In the Interest of G. R. B.*, 330 Ga. App. at 700-01; *In the Interest of S. D.*, 316 Ga. App. 86, 86 (728 SE2d 749) (2012); *In the Interest of J. H.*, 310 Ga. App. 401, 402 (713 SE2d 472) (2011).

[14]  *In the Interest of E. N. R.*, 323 Ga. App. at 816 (punctuation omitted and emphasis supplied); *accord In the Interest of D. H. D.*, 289 Ga. App. 32, 35 (656 SE2d 183) (2007)

7

present dependency must always be *proved in court* by clear and convincing evidence.[15]

As explained by the majority, the mother in this case was deprived of several constitutional and statutory rights, including her right to a hearing within 72 hours of the court's grant of custody to the maternal grandmother, her right to reasonable notice of that hearing, and her right to written factual findings by the juvenile court to support its ruling. But perhaps the most troubling aspect of this case is that the mother's constitutional right to the custody, care, and control over her own children was almost entirely ignored when the court granted temporary custody to the maternal grandmother without any evidence that the children were *presently* dependent—*i.e.*, no showing had been made by the State that the children were dependent as a result of their mother's unfitness to care for them.[16] Indeed, at the time of the initial September 2016 hearing, the children had not been in their mother's physical custody for several months. Nevertheless, the State contends that the mother's rights were not

---

[15] *See, e.g.*, *Brawner*, 334 Ga. App. at 216; *In the Interest of G. R. B.*, 330 Ga. App. at 700; *In the Interest of E. N. R.*, 323 Ga. App. at 816; *In the Interest of S. D.*, 316 Ga. App. at 86. Here, the sole basis for the juvenile court's custody decision appears to be educational neglect. But, again, no witness testimony or other evidence was presented to support the court's finding.

[16] *See supra* notes 14-15 & accompanying text.

violated because it did not take the children into custody or place them in foster care. This is utter nonsense. As the majority rightly notes, a parent does not surrender her custodial rights to a relative merely because she allows her children to temporarily visit that relative for the summer.

The State also argues that any error committed by the trial court in the September 26, 2016 interim custody order—*i.e.*, the order issued before the mother had notice of the proceeding and prior to her appearance in court—was harmless because the mother ultimately had a full and fair opportunity to contest the order. But given the gravity of the constitutional rights at stake and the length of time the mother involuntarily spent away from her children, I find this argument as offensive as it is unavailing.[17]

In sum, I take this opportunity, yet again,[18] to remind our juvenile courts and the State that, in making any decision or taking any action that interferes with a parent-child

---

[17] *See e.g.*, *In the Interest of J. M. B.*, 296 Ga. App. 786, 790-91 (676 SE2d 9) (2009) (holding, in a termination case involving a parent's "fundamental and fiercely guarded right to his or her child," that the total and erroneous denial of appointed counsel during the termination hearing was presumptively harmful because it called into question the very structural integrity of the fact-finding process).

[18] *See*, e.g., *In Interest of R. S. T.*, 345 Ga. App. 300, 314-21 (812 SE2d 614) (2018) (Dillard, C. J., concurring fully and specially); *In the Interest of C. H.*, 343 Ga. App. at 13-19 (Dillard, C. J., concurring fully and specially).

relationship, our Juvenile Code is subordinate to and must be construed in light of the fundamental rights recognized by the federal and Georgia constitutions. As this Court has rightly recognized, "[t]he constitutional right of familial relations is not provided by government; it preexists government."[19] Indeed, this "cherished and sacrosanct right is not a gift from the sovereign; it is our natural birthright. Fixed. Innate. Unalienable."[20] Thus, regardless of a court's (or any other state actor's) personal feelings or perception of a parent's fitness to care for or retain custody of his or her child, careful consideration of these bedrock constitutional principles and safeguards must remain central to each case without exception. And when this fails to occur, we will not hesitate to remind our juvenile courts and the State of the solemn obligation our government has to safeguard the parental rights of the citizens it serves.

---

[19] *In Interest of E. G. L. B.*, 342 Ga. App. at 848; *accord In the Interest of C. H.*, 343 Ga. App. at 18 (Dillard, C. J., concurring fully and specially); *see In Interest of R. S. T.*, 345 Ga. App. 300, 315-16 (Dillard, C. J., concurring fully and specially) ("The liberty interest parents have in familial relations with their children is a natural-law right that has been enshrined in our positive law. It is a right that preexists government and one that we retain as a people separate and apart from any statute or constitution." (footnotes and punctuation omitted)).

[20] *In Interest of E. G. L. B.*, 342 Ga. App. at 848 (punctuation omitted); *accord In the Interest of C. H.*, 343 Ga. App. at 18 (Dillard, C. J., concurring fully and specially).